**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - **x**

**UNITED STATES OF AMERICA**                                   :

                    **-v-**                                    :       **S1 06 Cr. 600 (DLC)**

**ALI AWAD,**                                                  :
**ABDI EMIL MOGE, and**
**ABDULLAHI HUSSEIN,**                                         :

                              **Defendants.**                  :
- - - - - - - - - - - - - - - - - - - - **x**

**GOVERNMENT'S SENTENCING MEMORANDUM**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
      of America.

DANIEL L. STEIN
ANJAN SAHNI
Assistant United States Attorneys
      - Of Counsel -

The Government respectfully submits this memorandum in advance of the re-sentencing of defendants Abdullahi Hussein, Ali Awad, and Abdi Emil Moge.  Sentencing is scheduled for Friday, February 25, at 2:30 p.m.

**BACKGROUND**

**A.    The Charges**

Indictment S1 06 Cr. 600 (DLC) (the "Indictment") was returned on July 24, 2006 in six counts.  Count One of the Indictment charged defendants Awad, Moge, and Hussein with conspiring to distribute and possess with intent to distribute a controlled substance, namely mixtures and substances containing a detectable amount of cathinone, in violation of Title 21, United States Code, Section 846.  Count Two charged Awad, Moge, and Hussein with conspiring to import the same controlled substance into the United States from a place outside thereof, in violation of Title 21, United States Code, Section 963.  Count Three of the Indictment charged Moge and Awad with conspiring to launder the cash proceeds of narcotics transactions, in violation of Title 18, United States Code, Section 1956(h).[1]  More specifically, Count Three charged that the defendants conspired to conduct financial transactions involving the proceeds of specified unlawful activity, to wit, narcotics transactions, knowing that

---

[1]    Prior to trial, the Government elected not to proceed on Count Three against defendant Awad.

2

the property involved in those transactions represented the
proceeds of some form of illegal activity and that the
transactions were designed, in whole or in part, to conceal or
disguise the nature, location, source, ownership, and control of
those proceeds, and intending to promote the carrying on of
additional narcotics transactions.  Finally, Counts Five and Six
charged Awad and Moge, respectively, with operating a continuing
criminal enterprise, in violation of Title 21, United States
Code, Section 848.

**B.   The Trial Verdict**

On June 26, 2007, the jury returned a mixed verdict.
The jury convicted Awad of conspiracy to distribute khat
containing cathinone (Count One) and conspiracy to import khat
containing cathinone (Count Two), but acquitted him of engaging
in a continuing criminal enterprise (Count Four).  As to
defendant Moge, the jury convicted him of Counts One and Two, as
well as Count Three (conspiracy to commit money laundering), but
also acquitted him of engaging in a continuing criminal
enterprise.  With respect to defendant Hussein, the jury
convicted him on Count One, but acquitted him on Count Two.

As to Count One, the jury found, in a special
interrogatory, that the Government had not proven beyond a
reasonable doubt that the conspiracy succeeded in distributing
cathinone.  With regard to Count Two, the jury found, also in a

3

special interrogatory, that the Government *did* prove beyond a
reasonable doubt that the conspiracy succeeded in importing
cathinone.

## C.   The Sentencing Proceedings

On September 27, 2007, the Court conducted an
evidentiary hearing pursuant to *United States v. Fatico*,
579 F.2d 707 (2d Cir. 1978).  The primary reason for the hearing
was to determine the drug quantity attributable to Awad and Moge
for Guidelines purposes — specifically, the quantity of khat
attributable to each defendant.  At the hearing, the Government
called the two cooperating witnesses who had testified at
trial: Bashi Muse ("Muse") and Hassan Sadiq Mohamed ("Mohammed").

On October 5, 2007, Awad, Moge, and Hussein appeared
for sentencing.  At the outset of the proceeding, the Court
concluded that the maximum sentence applicable to Count One was
12 months' imprisonment, pursuant to Title 21, United States
Code, Section 841(b)(3), which applies "[i]n the case of a
controlled substance in schedule V" — the least serious schedule
under the Controlled Substances Act.  The Court noted that the
instructions had allowed the jury to convict if it found that a
defendant agreed to distribute khat knowing that it contained
cathinone *or* knowing that it contained "some substance controlled
under American drug abuse law."  (Sent. Tr. 12-13).  The Court
reasoned that this instruction, combined with the jury's answer

4

to the special interrogatory, meant that there was "no guidance from the jury whatsoever with respect to what controlled substance, much less an amount."  (Sent. Tr. 14-15).

The result, in the Court's view, was an "*Apprendi* problem" because drug type and quantity are, following *Apprendi*, elements that must be found by the jury beyond a reasonable doubt.  (Sent. Tr. 14).  Thus, the Court concluded: "I am left with the conclusion that I should use the lowest scheduling amount" -- that is, Section 841(b)(3) -- which sends us to the maximum term of imprisonment of 12 months, which is, in effect, . . . a class A misdemeanor."  (Sent. Tr. 15).  In light of the jury's affirmative answer to the special interrogatory on Count Two, the Court concluded there was no "*Apprendi* problem" with respect to that count, and the maximum sentence was therefore 20 years pursuant to Section 841(b)(1)(C).  (Sent. Tr. 13).

The Court then proceeded to sentence Awad, Moge, and Hussein.  Hussein was sentenced to 12 months' imprisonment on Count One, the only count of which he was convicted.  In sentencing Hussein, the Court acknowledged that the applicable Guidelines range was "far beyond" the 12-month statutory maximum to which he had been sentenced.  (Tr. 15-16).  The Court sentenced Awad to 12 months on Count One and 121 months on Count Two, to be served concurrently.  Finally, the Court sentenced

5

Moge to 12 months on Count One and 121 months each on Counts Two
and Three, all to be served concurrently.

**D.   The Appeal**

On appeal, Awad, Moge, and Hussein challenged their
convictions on various grounds; Awad and Moge (but not Hussein)
also appealed their sentences.  The Government cross-appealed the
Court's sentence on Count One, namely, its determination that the
applicable statutory maximum as to that count was one year.

On March 10, 2010, the Court of Appeals, in a summary
order (the "Summary Order"), affirmed the convictions of all
three defendants (as well as the convictions of the four
defendants tried in November 2007).  The Court of Appeals
affirmed Moge's and Awad's sentences on Count Two, but vacated
their (and Hussein's) sentence on Count One based upon the
Government's cross-appeal.  The Court of Appeals explained that
because "[c]athinone was the only controlled substance charged in
Count One of the Indictment," there was "no danger that the
defendants' sentence would be based on a fact that had not been
submitted to the jury and proven beyond a reasonable doubt."
(Summary Order at 13-14).  And "although there was testimony
about cathine, another stimulant contained in the khat plant, at
trial," the jury specifically had been instructed that cathine is
not a controlled substance.  (*Id.* at 14).  Accordingly, "[t]here
was no risk that the defendants would be subjected 'to a greater

punishment than that authorized by the jury's guilty verdict.'"
(*Id.* (quoting *United States* v. *Gonzalez*, 420 F.3d 111, 123 (2d
Cir. 2005)).

Accordingly, the Court of Appeals vacated Awad, Moge,
and Hussein's sentence on Count One and remanded "solely so that
the defendants can be sentenced pursuant to the proper statutory
provision." (Summary Order at 14-15).  The Court of Appeals
observed that "[i]n vacating the sentence imposed under Count One
with respect to Awad, Moge, and Hussein, we express no view on
the sentence that should be imposed" on remand.  (*Id.*).

### DISCUSSION

**A.   Applicable Law**

When, as in this case, the Court of Appeals remands due
to a sentencing error, the default rule is that re-sentencing is
limited to a correction of the specific sentencing error
identified on appeal.  *See United States* v. *Rigas*, 583 F.3d 108,
115-16 (2d Cir. 2009) ("[L]imited resentencing [is] the default
rule where there was a sentencing error," as opposed to a
conviction error.") (emphasis in original) (citing *United States*
v. *Quintieri*, 306 F.3d 1217, 1228 n.6 (2d Cir. 2002)).  In such
cases, a district court may conduct a *de novo* re-sentencing only
if "one or more specific sentencing errors . . . would undo the
sentencing calculation as a whole or the 'spirit of the mandate'
otherwise requires de novo resentencing."  *United States* v.

7

*Rigas*, 583 F.3d at 115-16 (citing *United States* v. *Quintieri*, 306 F.3d at 1228 n.6).

In this case, the remand was plainly due to a specific sentencing error, not a conviction error, and nothing in the mandate remotely suggests that a *de novo* sentencing is required. *See* Summary Order at 14-15 ("In vacating the sentenced imposed under Count One with respect to Awad, Moge, and Hussein, we express no view on the sentence that should be imposed by the district court.  Rather, we remand *solely* so that defendants can be sentenced pursuant to the proper statutory provision.") (emphasis added).  To the contrary, in this case, this Court's sentences on Count Two involved precisely the same issues as the sentences on Count One, and there is no reason to believe that, but for its view as to the statutory maximum sentence applicable to Count One, this Court would have imposed a different sentence on that count.  Thus, to the extent one can divine any "spirit" of the mandate, that "spirit" would tend to suggest that a very limited re-sentencing is called for here.

Moreover, not only did this Court address every pertinent sentencing issue in its analysis of the sentence to be imposed on Count Two, the Court of Appeals affirmed this Court's analyses of those issues in all respects.  This Court's determinations with respect to those sentencing issues are, therefore, the law of the case, to which this Court and the

8

parties must adhere on remand.  *See Quintieri*, 306 F.3d at 1225 ("The law of the case doctrine . . . requires a trial court to follow an appellate court's previous ruling on an issue in the same case.").  This Court could not, therefore, consistent with the mandate rule, conduct a plenary re-sentencing, as defendants Awad and Moge request, since virtually all of the relevant issues have been conclusively resolved by the Court of Appeals.

        Defendants Awad and Moge assert that the "spirit" of the mandate in this case somehow requires a *de novo* sentencing (Awad Br. 4; Moge Br. 2), but do not offer any indication as to why that is so.  Moge argues that the "knot of calculation" was undone by the *vacatur* of Moge's sentence on Count One, but can not identify (because there are none) a single Sentencing Guidelines issue that is altered by the ruling on appeal.  In this regard, Moge refers to the Second Circuit's decision in *United States* v. *Johnson*, 378 F.3d 230, 240 (2d Cir. 2004), in which the court found that the "knot of calculation" had been undone by its prior ruling on appeal.  But that case involved a specific Sentencing Guidelines enhancement that was not considered at the prior sentencing because of the trial court's erroneous conclusion as to the statutory maximum sentence, which resulted in a Guidelines range that exceeded what the court believed to be the maximum sentence.  When the appellate court's ruling established that a higher maximum sentence applied, the

9

court reasoned that it was appropriate for the district court to take into account the specific enhancement it had declined to consider before.  No similar circumstance exists here, where, in stark contrast to *Johnson*, this Court's sentence on Count Two addressed each of the issues relevant to Count One.

For his part, Awad cites the court's statement in *United States* v. *Rigas*, 583 F.3d at 118, for the proposition that when a district court conducts a *de novo* resentencing it "must reconsider the sentences imposed on each count as well as the aggregate sentence." (Awad Br. 5).  But this citation says nothing about *whether* or not a *de novo* resentencing is appropriate and, thus, does not support Awad's argument in any meaningful way.

Accordingly, the Government respectfully submits that, in this case, the mandate of the Court of Appeals requires that re-sentencing be limited to a consideration of the implications arising out of the correction of the applicable statutory maximum sentence on Count One.[2]

---

[2]     Moge also relies on *United States* v. *Bryson*, 229 F.3d 425 (2d Cir. 2000), for the proposition that, even if the remand "is limited to a specific sentencing issue," the District Court may nevertheless consider intervening circumstances, including extraordinary rehabilitation, to fashion an "overall, lower sentence."  (Moge Br. 4-5).  Contrary to Moge's unduly broad reading of *Bryson*, that case simply establishes that when the Court of Appeals remands for re-sentencing on one or more counts, the district court may consider intervening circumstances during re-sentencing, subject to the mandate.  In *Bryson*, the Court of Appeals vacated the entirety of the sentence; thus, the district

**B.    The Sentences For Awad And Moge**

Consistent with the above-referenced principles, Awad's and Moge's sentence on Count Two should remain unaltered, as re-sentencing on that count would be beyond the scope of the mandate and remand order.  With respect to Count One, even considering the intervening circumstances that Moge has raised, the Government submits that a sentence of 121 months is appropriate.

The only new circumstance that Moge points to that was not previously considered during his initial sentencing is his "institutional adjustment."  (Moge Br. 11).  To his credit, Moge has taken advantage of the educational opportunities available to him at the Northeast Ohio Correctional Center, where he has been serving his sentence.  (Moge Br. 11).  The Government respectfully submits, however, that, while laudable, this factor does not merit a variance under Section 3553(a), especially when compared to the seriousness of Moge's offense, and the longevity of his involvement in the khat trade.  For the same reasons

---

court erred on remand in concluding that it could not consider intervening circumstances in re-imposing sentence.  Applying *Bryson* here, this Court can consider intervening circumstances with respect to re-sentencing on Count One.  But *Bryson* does not extend to consideration of intervening circumstances with respect to Count Two, as re-sentencing on that count is clearly beyond the scope of the mandate and remand order.

underlying the Court's sentence on Count Two, a sentence of 121
months on Count One is reasonable and appropriate for Moge.[3]

Awad points to no new or intervening circumstances.
The gravamen of his arguments for a variance already were
considered by the Court at the time of the initial sentencing,
and, with the exception of the conclusion regarding the statutory
maximum on Count One, the Court of Appeals affirmed the sentence
in all respects.  Accordingly, for the same reasons underlying
the Court's sentence on Count Two, a sentence of 121 months on
Count One is reasonable and appropriate as to Awad.

C.    **The Sentence For Abdulahi Hussein**

At the initial sentencing proceeding in October 2007,
the Court noted, with respect to Hussein's sentence:

> [T]he guidelines calculations become
> unnecessary because whatever guideline I would
> compute for him would be far beyond the 12
> months.  Conservatively, he would be, in terms
> of drug quantity, in a level 8 situation.  If
> the fact finding didn't go his way, in as many
> instances, he would be in a level 16.  Either
> of those have a guidelines range above 12
> months.  I expect I wouldn't give him any
> leadership role, though the government asks for
> two levels.  I know he did try to recruit
> couriers and worked with couriers, but I think
> that, in terms of leadership, I would have to
> describe him more as a wannabe, someone who
> would have liked to have had a leadership role,
> liked to play a more significant role in the

---

[3]    Moge objects to the application of an enhancement for
the use of children as couriers.  (Br. 7).  The Government did
not seek this enhancement at the initial sentencing, nor is it
seeking the enhancement now.

> khat distribution network, but who didn't
> actually achieve that kind of influence, power
> or other accoutrements of command and
> leadership.

(Tr. 15-16).

During the initial sentencing proceeding, the Government argued that the total drug quantity attributable to Hussein was at least 10,000 bundles of khat and as much as 18,000 bundles. This is equivalent to 10 to 18 kilograms of marijuana, which corresponds to a base offense level of 16. The Government adheres to that quantity determination for purposes of re-sentencing.

The testimony presented regarding Hussein's participation in the khat business establishes that he was personally involved in importing and/or distributing the following quantities:

a. In early 2004, Hussein delivered khat from one city to another on behalf of Abdikani Hussein. (Hearing Tr. 14). At that time, he transported approximately 300 bundles of khat, twice per week. (Hearing Tr. 15). Because Hassan Sadiq Mohamed was unable to testify specifically about the time period during which this conduct occurred, the Government concedes that there is no basis to quantify it.

b. Hassan Sadiq Mohamed undertook to send three couriers to England with Hussein. Each courier would have

13

transported 200 pieces.   Thus, this conduct involved a quantity of 600 pieces of khat.

c.   Before jointly undertaking to send the three couriers to England, Hassan Sadiq Mohamed made sure that Hussein had successfully sent couriers in the past, and learned, in this regard, that Hussein had received a total of 10 couriers, with each carrying 250 pieces of khat, for a total of 2,500 pieces of khat.

d.   Hussein later became a retail seller of khat in Portland, Maine.   This conduct was from approximately January to June 2006.   (Hearing Tr. 17-18).   According to Mohamed, Hussein received khat in express mail packages sent to the homes of various white women.   Mohamed testified that Hussein received 3 to 4 boxes per week, with 90 to 120 pieces in each box, resulting in a total quantity for this activity of 270 to 480 pieces per week.   Over 24 weeks, this yields a total of 6,480 to 11,520 pieces of khat.   In addition, Mohamed supplied Hussein with khat, and estimated that he provided him with 200 to 600 bundles per month over approximately 6 months (Hearing Tr. 18-19), or 1,200 to 3,600 pieces of khat.   Adding these two sources of supply together results in a range of 7,680 to 15,120 pieces of khat.

Adding together the amount of khat imported and distributed during the different phases of Hussein's involvement

14

in the khat business results in a total drug quantity of at least 10,000 bundles of khat and as much as 18,000 bundles.[4]  This is equivalent to 10 to 18 kilograms of marijuana, which corresponds to a base offense level of 16.

At the initial sentencing, the Government also sought a two-level enhancement for leadership under U.S.S.G. § 3B1.1.  The Government's application was based on the trial testimony of Hassan Sadiq Mohamed that, with respect to his joint venture with Hussein to send couriers to England, it was Hussein's responsibility to recruit the couriers.  (Trial Tr. 1081).  This testimony was corroborated by two DEA agents who met, in an undercover capacity, with Hussein and whom Hussein attempted to recruit.  *Accord* U.S.S.G. § 3B1.1., comment. (n.4) ("Factors the court should consider include . . . the recruitment of accomplices . . . .").  As noted, the Court indicated at the initial sentencing that it did not "expect . . . [to] give [Hussein] any leadership role adjustment."  Accordingly, the Government is not seeking such an enhancement here.

Because of his narcotics conviction in April 2007, for which he was sentenced to four months' imprisonment, Hussein has two criminal history points and is in Criminal History Category

---

[4]    3,100 bundles (receiving couriers) + 7,680 to 15,120 (retail business).

II.[4]  With a base offense level of 16 and in Criminal History Category II, Hussein faces a Guidelines range of 24 to 30 months' imprisonment.  The Government submits that a sentence within this Guidelines range would be appropriate in this case.

Hussein's request for a sentence of time served is based primarily on his chronic back pain, which he asserts would be aggravated from further incarceration.  (Hussein Br. 2-3). According to Dr. Beth Chesler, "[o]nly under the care of specialists and treatment with effective pain medications can it be expected that his overall medical condition will improve." (Chesler Letter at 2.)  Hussein clearly has a serious back condition, which the Government does not intend to minimize in any respect.  However, neither Hussein's submission, nor the letter from Dr. Chesler, adequately explain why Hussein would not receive effective treatment while in the custody of the Bureau of Prisons ("BOP").  In fact, it appears that Hussein's back ailments were not properly diagnosed until March 2009 -- after his last period of incarceration -- when he underwent a "Section 207 Comprehensive Medical Examination."  (*Id.* at 1).

The BOP has a range of medical resources that are available to a defendant.  To determine placement at a particular

---

[4]     The Presentence Investigation Report indicates that Hussein has two criminal history points and is therefore in Criminal History Category II.  (PSR ¶ 142-44).  However, in another place, the Report states that Hussein is in Criminal History Category I.  (PSR at 33).

16

institution, the BOP generally utilizes a classification system to match inmates with institutions that can best meet an inmate's medical needs.  Thus, rather than reducing Hussein's sentence based on his medical conditions, the Court could ensure that his conditions are noted for the purposes of BOP's designation.


Dated:     New York, New York
           February 18, 2011

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney

           By:  s/_____
                         Daniel L. Stein
                         Anjan Sahni
                         Assistant United States Attorneys
                         Telephone: (212) 637-2407/-2491

<u>CERTIFICATE OF SERVICE</u>

ANJAN SAHNI deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on February 18, 2011, he served a copy of the attached Government's Sentencing Memorandum by ECF.


I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.


<u>   /s/                        </u>
Anjan Sahni

Executed on: February 18, 2011
             New York, New York

18